STATE of Minnesota, Petitioner,
Appellant,

v.

Marvin Russell LARSEN, Respondent.

No. C5–01–980.

Supreme Court of Minnesota.

Aug. 29, 2002.

Mike Hatch, Attorney General, St. Paul, MN, G. Paul Beaumaster, Nathaniel J. Reitz, Faribault, MN, Appellant.

Samuel A. McCloud, Carson J. Heefner, McCloud & Boedigheimer, P.A., Shakopee, MN, Respondent.

Kevin G. Ross, Greene Espel, P.L.L.P., Minneapolis, MN, Attorney for Amicus Minnesota Conservation Officers' Association.

## OPINION

STRINGER, Justice.

In the course of his duties, a Minnesota conservation officer entered the fish house of Marvin Russell Larsen (respondent) to conduct a routine license check. Upon entry, the officer discovered that respondent had three fishing lines in the water and that he was in possession of marijuana. Respondent was charged with a controlled substance offense and angling with one more line than allowed under his license. Respondent moved to suppress all evidence as obtained in an unauthorized search of his fish house. The district court granted respondent's motion and dismissed all charges, and the court of appeals affirmed. We affirm.

On the evening of January 31, 2001, Officer Scott Fritz, a licensed peace officer employed by the Minnesota Department of Natural Resources as a conservation officer, was patrolling fish house activities on Circle Lake in Rice County, Minnesota. Circle Lake has a public access that provides an entrance point for anglers and snowmobilers and Officer Fritz estimated that on this particular day there were approximately 60 to 80 fish houses on the lake. In the performance of his duties under Minn.Stat. § 97A.215 (2000),[1] Officer Fritz proceeded from fish house to fish house knocking on occupied shelters, identifying himself, and checking licenses. At approximately 6:30 p.m., Officer Fritz arrived at respondent's fish house which was illuminated and had a vehicle parked next to it. Officer Fritz knocked on the door, identified himself as a state game warden and simultaneously opened the door. As he entered, he had no reason to suspect a violation of fishing laws and concedes that respondent did not expressly consent to his entry. Officer Fritz believed however, that he had authority to enter and inspect occupied fish shelters in this manner under Minnesota law.

Upon entering the fish house, Officer Fritz noticed a strong smell of marijuana and saw what appeared to be a marijuana cigarette. He conducted a pat-down search of respondent and found a bag of marijuana. He also noticed that respondent had three lines in the water when only two are permitted. Respondent was charged with possession of a controlled substance pursuant to Minn.Stat. § 152.027, subd. 4 (2000), and unlawful angling lines pursuant to Minn.Stat. § 97C.315 (2000).

Respondent moved to suppress all evidence obtained as a result of Officer Fritz's entry and search of his fish house and to have the charges against him dismissed, asserting that Minn.Stat. § 97A.215 authorizing a conservation officer to "enter and inspect" his fish house was unconstitutional. Respondent further argued that a fish house is a temporary place of occupancy for anglers, and as such, it is frequently equipped with various accommodations for short-term living including heating, cooking, and other conveniences such as television and sleeping accommodations, much like a private home, and as with a private home, an enforcement officer is without lawful authority to conduct a search of a private fish house without a warrant or other circumstance authorizing an entry. The district court granted respondent's motion ruling that although a fish house was not necessarily comparable to a home, an occupant has a reasonable expectation of privacy and Officer Fritz's entry into respondent's fish house without consent, a warrant, probable cause, or articulable suspicion was unlawful. In doing so, the district court rejected the state's argument that the exception to the warrant requirement for administrative inspections of "closely regulated" businesses applied, *see New York v. Burger*, 482 U.S. 691, 693, 107 S.Ct. 2636, 96 L.Ed.2d 601 (1987), noting that recreational fishing is a purely private activity and occupants should not be subject to the more relaxed standards of right to privacy accorded commercial entities.

The state appealed asserting that Officer Fritz's entry into respondent's fish

---

**1.** Minnesota Statutes § 97A.215, subd. 3 (2000) provides:

An enforcement officer may, at reasonable times:

(1) enter and inspect the premises of an activity requiring a license under the game and fish laws; and
(2) stop and inspect a motor vehicle requiring a license under the game and fish laws.

house without a warrant was authorized under Minn.Stat. § 97A.215, subd. 3:

> An enforcement officer may, at reasonable times:
>
> (1) enter and inspect the premises of an activity requiring a license under the game and fish laws;
>
> \* \* \* \*

The state argued that the statute and regulatory inspections conducted pursuant to it are constitutional and that despite whatever comforts may be added, occupants of a fish house have no greater an expectation of privacy than occupants of a commercial business. The court of appeals disagreed and affirmed the district court's ruling. *State v. Larsen*, 637 N.W.2d 315, 316, 325 (Minn.App.2001).[2] The court rejected the state's argument that to effectively enforce conservation laws conservation officers must have broader powers than other law enforcement officers and that the Minnesota Legislature authorized those broader powers in Minn.Stat. § 97A.215. *Id.* at 323–25. The court did not declare the statute unconstitutional, but concluded that the authority of a conservation officer to search a person or place, like that of all other law enforcement officers, is subject to and limited by the Minnesota Constitution and the Fourth Amendment of the United States Constitution. *Id.* at 323–24. The court ruled that the statutory provisions authorizing entry and inspection at "reasonable times" must be interpreted to authorize entry only when constitutionally permissible.[3] *Id.* at

324. We granted review of the court of appeals decision.

### I.

 In reviewing pretrial orders suppressing evidence where the facts are not in dispute, we independently review the record and determine, as a matter of law, whether the district court erred in suppressing the evidence. *See State v. Harris*, 590 N.W.2d 90, 98 (Minn.1999); *State v. Othoudt*, 482 N.W.2d 218, 221 (Minn. 1992). Whether a statute is constitutional and whether it has been properly construed are questions of law subject to our de novo review. *State v. Behl*, 564 N.W.2d 560, 566 (Minn.1997); *State v. Murphy*, 545 N.W.2d 909, 914 (Minn.1996). Statutes are presumed constitutional, and the court will exercise its power to declare a statute unconstitutional with extreme caution and only when absolutely necessary. *Boutin v. LaFleur*, 591 N.W.2d 711, 714 (Minn.), *cert. denied*, 528 U.S. 973, 120 S.Ct. 417, 145 L.Ed.2d 326 (1999).

The right to be free from unauthorized entry into one's abode is ancient and venerable. As William Pitt, Earl of Chatham, so vividly put it in 1766:

> The poorest man may in his cottage bid defiance to all the forces of the Crown. It may be frail, its roof may shake; the wind may blow through it; the storm may enter, the rain may enter—but the King of England cannot enter; all his force dares not cross the threshold of the ruined tenement!

---

**2.** The court of appeals emphasized the similarity between the facts of this case and those of *State v. Krenz*, 634 N.W.2d 231 (Minn.App. 2001), where the court likewise dismissed the state's arguments that the warrantless entry of a fish house was constitutional. *Larsen*, 637 N.W.2d at 317–22.

**3.** The statute does not define the "at reasonable times" limitation it places on an enforcement officer's authority to inspect under sub-

division 3. In comparison, the language of subdivisions 1 and 2, pertaining to the storage of wild animals and the inspection of certain records respectively, does not reference reasonableness but does limit an enforcement officer's right to inspect to circumstances where the officer "has probable cause to believe" there has been a violation. Minn.Stat. § 97A.215, subds. 1–2 (2000).

*Speech on the Excise Bill, House of Lords* (1766), in The MacMillan Book of Proverbs, Maxims,. and Famous Phrases 1191–92 (Burton Stevenson ed., 1948). Similarly, the dissenting opinion of Justice Brandeis in *Olmstead v. United States,* 277 U.S. 438, 48 S.Ct. 564, 72 L.Ed. 944 (1928), memorably captures the importance of this fundamental right:

> [T]he right to be left alone—the most comprehensive of rights and the right most valued by civilized men. To protect that right, every unjustifiable intrusion by the government upon the privacy of the individual, whatever the means employed, must be deemed a violation of the Fourth Amendment.

*Id.* at 478, 48 S.Ct. 564 (Brandeis, J., dissenting). Concerns for this essential element of our personal freedom are reflected in the Fourth Amendment and art. I, § 10 of the Minnesota Constitution protecting the "right of the people to be secure in their persons, houses, papers, and effects against unreasonable searches and seizures." U.S. Const. amend. IV; *see* Minn. Const. art. I, § 10.

 Entry constitutes a search whenever there is an intrusion upon an area where a person has a reasonable expectation of privacy. *State v. Hardy,* 577 N.W.2d 212, 215 (Minn.1998). Warrantless searches where an individual has a reasonable expectation of privacy "are *per se* unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions." *Katz v. United States,* 389 U.S. 347, 357, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967); *see also Matter of Welfare of D.A.G.,* 484 N.W.2d 787, 789 (Minn.1992) (extending the *per se* concept to the Minnesota Constitution); *O'Connor v. Johnson,* 287 N.W.2d 400, 405 (Minn.1979) (discussing the greater protections available under the Minnesota Constitution).

But an expectation of privacy does not have the constitutional right to· be free from impermissible search as its roots. As the Supreme Court noted in *Minnesota v. Carter,* an expectation of privacy "has 'a source outside of the Fourth Amendment, either by reference to concepts of real or personal property law or to understandings that are recognized and permitted by society.' " 525 U.S. 83, 88, 119 S.Ct. 469, 142 L.Ed.2d 373 (1998) (quoting *Rakas v. Illinois,* 439 U.S. 128, 143 n. 12, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978)).

The Supreme Court has recognized that an expectation of privacy is reasonable in one's home and curtilage, *Payton v. New York,* 445 U.S. 573, 589–90, 100 S.Ct. 1371, 63 .L.Ed.2d 639 (1980), in one's automobile, *Delaware v. Prouse,* 440 U.S. 648, 662–63, 99 S.Ct. 1391, 59 L.Ed.2d 660 (1979), and in a closed telephone booth, *Katz,* 389 U.S. at 352, 88 S.Ct. 507. We have similarly acknowledged a constitutionally protected expectation of privacy in one's home and curtilage, *State v. Perkins,* 582 N.W.2d 876, 878 (Minn.1998), *Garza v. State,* 632 N.W.2d 633, 639 (Minn.2001), in one's automobile, *State v. Goodrich,* 256 N.W.2d 506, 510 (Minn.1977), and in a public restroom, *State v. Bryant,* 287 Minn. 205, 211–12, 177 N.W.2d 800, 804 (1970).

The Supreme Court and the courts of Minnesota have applied balancing tests to determine the constitutionality of law enforcement searches and seizures under the federal and state constitutions where the nature and significance of the intrusion on the individual's privacy interests are balanced against the gravity of the public concerns it serves and the degree to which the conduct at issue advances the public interest. For example, in *Prouse,* the Supreme Court held that the state's interest in ensuring roadway safety did not outweigh the intrusion on the privacy and security of persons detained in random

automotive stops for the purpose of checking driver's license and registration, 440 U.S. at 659, 99 S.Ct. 1391. Similarly in *Brown v. Texas*, 443 U.S. 47, 51–52, 99 S.Ct. 2637, 61 L.Ed.2d 357 (1979), the Supreme Court considered the validity of a conviction under a state statute requiring a person to provide his name and address to an officer who lawfully stops the person and requests the information. The Court concluded that because the officers lacked any reasonable suspicion to believe that the defendant was involved in criminal activity when he was stopped, the balance between the public interest in crime prevention and the defendant's right to personal privacy tilted in favor of freedom from police interference. *Id.* On the other hand, in *Michigan Dep't of State Police v. Sitz*, 496 U.S. 444, 455, 110 S.Ct. 2481, 110 L.Ed.2d 412 (1990), the Supreme Court determined that the state's interest in preventing drunken driving and the extent to which Michigan's highway sobriety checkpoint program reasonably advanced that interest outweighed the intrusion on motorists required to stop at random sobriety checkpoints.

We applied a balancing test in *Ascher v. Comm'r of Public Safety*, 519 N.W.2d 183, 186–87 (Minn.1994), and on facts similar to those in the Supreme Court decision in *Sitz*, we came to the opposite conclusion. We held that the state failed to articulate a persuasive reason for dispensing with the usual individualized suspicion requirement when it used temporary roadblocks to stop vehicles for the purpose of apprehending alcohol-impaired drivers, and therefore the stop violated Minn. Const. art. I, § 10.

*Ascher*, 519 N.W.2d at 186–87. We ruled that the constitutional balance weighed in favor of protecting the traveling public from even minimal intrusion. *Id.* at 187.

The state argues that longstanding laws regulating angling in Minnesota have alerted anglers for decades that conservation officers are authorized to enter their fish houses without permission or probable cause, citing Minn.Stat. § 97.50, subd. 1(4) (1945) (now found at Minn.Stat. § 97A.215, subd. 3), and further, anglers are aware that they are prohibited from locking out regulatory inspectors, citing Minn.Stat. § 97C.355, subd. 3 (2000). Therefore, the state argues, anglers in a fish house can have no reasonable expectation of privacy.

We consider the nature of the premises here—a fish house, erected and equipped to protect its occupants from the elements and often providing eating, sleeping, and other facilities—as providing privacy for activities " 'recognized and permitted by society.' " *Carter*, 525 U.S. at 88, 119 S.Ct. 469 (citation omitted). While clearly not a substitute for one's private dwelling, during the period of occupancy important activities of a personal nature take place. We therefore conclude appellant had a reasonable expectation of privacy in his fish house. The question then is whether the public interest in preserving and protecting its natural fish resource by permitting conservation officers to enter fish houses without probable cause is sufficient to justify the violation of appellant's reasonable expectation of privacy in violation of his constitutional rights. We conclude that it is not.[4]

---

4. The legislature apparently does not disagree because in Minn.Stat. § .97A.205 (2000), outlining the powers of enforcement officers including conservation officers, it has provided: "Nothing in this section grants an enforcement officer any greater powers than other licensed peace officers." *See also Sorenson,*

441 N.W.2d at 459 (indicating that searches by "[c]onservation officers, like other law enforcement officers, are subject to the requirements of the fourth amendment and other constitutional provisions" as "the same possibilities exist for abuse").

Our ruling in *Ascher* is particularly informative here. In *Ascher*, we ruled that the key issue was not whether the stops were discriminatory, but that the state had failed to articulate a sufficiently persuasive reason for departing from the general requirement that stops of motorists be based on individualized suspicion. 519 N.W.2d at 186. We held that the state was not able to show that complying with the rule requiring individualized suspicion was impractical, for example, or that departing from it would significantly increase the effectiveness of law enforcement. *Id.* at 186–87. Nor was the state able to show that the purpose for deviating from the rule requiring individualized suspicion outweighed the interests of ordinary citizens in not having their privacy invaded by police, absent individualized suspicion. *Id.* at 187. We held that the roadblocks violated Minn. Const. art. I, § 10. *Id.*

▆ Comparing the privacy interest of appellant in his fish house with that of the occupants of motor vehicles stopped at the roadblocks in *Ascher*, we have no difficulty concluding that appellant's privacy interest is at least as great as that of the motor vehicle occupants in *Ascher*. Personal activities of occupants of a fish house would certainly have privacy values " 'recognized and permitted by society,' " *Carter*, 525 U.S. at 88, 119 S.Ct. 469 (citation omitted), at least equal to those of occupants of a motor vehicle traveling public highways. Similarly, the public interest at stake

here—protection of the fishing resource—is surely no greater than that at stake in *Ascher*—protection of human lives through deterrence of drunk driving. Our ruling in *Ascher* then, that even the state's interest in apprehending drunk drivers does not outweigh the right of privacy in an automobile, is compelling in reaching our conclusion that respondent had a reasonable expectation of privacy that was violated when Officer Fritz entered his fish house on January 31 without permission, probable cause or other justification.[5]

## II.

▆ The state argues however, that based on the duration and pervasiveness of Minnesota's regulatory scheme of conservation evidenced by our constitution and state laws,[6] entry into fish houses falls within an exception to the constitutional protections from search because it is an administrative inspection in a "closely regulated" industry. *See, e.g., United States v. Biswell*, 406 U.S. 311, 92 S.Ct. 1593, 32 L.Ed.2d 87 (1972) (involving business engaged in sale of firearms); *Colonnade Catering Corp. v. United States*, 397 U.S. 72, 90 S.Ct. 774, 25 L.Ed.2d 60 (1970) (involving business engaged in sale of liquor). In so arguing, the state relies heavily on the United States Supreme Court decisions in *New York v. Burger*, 482 U.S. 691, 107 S.Ct. 2636, 96 L.Ed.2d 601 (1987), and *Minnesota v. Carter*, 525 U.S. 83, 119 S.Ct. 469, 142 L.Ed.2d 373 (1998).

5. It is true that unlike traffic violations, fishing violations committed in fish houses may be difficult to detect and evidence may be destroyed before a warrant can be obtained, but ease in enforcing the law has never been a sufficient justification for government intrusion. As we stated in *Hardy*, where we ruled that a police officer's request that a defendant open his mouth was a search for Fourth Amendment purposes: "[T]he possibility that [the defendant] might ingest whatever substance was in his mouth did not eliminate the

need for police to have probable cause to believe that the substance was evidence of a crime before they could search for it." 577 N.W.2d at 217.

6. *See* Minn. Const. art. XIII, § 12 (imposing on the state a duty to manage "[h]unting and fishing and the taking of game and fish * * * by law and regulation for the public good" as they are "a valued part of our heritage"); *see generally* Minn.Stat. 97A, 97C (2000).

In *Burger*, the Supreme Court considered the constitutionality of a New York statute authorizing warrantless inspections of automobile junkyards. 482 U.S. at 695–99, 107 S.Ct. 2636. The court noted that although Fourth Amendment protection from unreasonable searches and seizures is applicable to commercial premises as well as private homes, the expectation of privacy in commercial property is less than in an individual's home and is "particularly attenuated in commercial property employed in 'closely regulated' industries." *Id.* at 699–700, 107 S.Ct. 2636. The Court ruled that a warrantless inspection of commercial premises is reasonable if three criteria are met:

(1) There [is] a "substantial" government interest that informs the regulatory scheme pursuant to which the inspection is made;

(2) The warrantless inspections [are] necessary to further the regulatory scheme; and

(3) The statute's inspection program, in terms of certainty and regularity of its application, [provides] a constitutionally adequate substitute for a warrant.

*Id.* at 702–03, 107 S.Ct. 2636 (internal alterations, citations and quotations omitted).

The state claims that all three criteria are met justifying Officer Fritz's warrantless search on the basis that fishing is a regulated industry. The state first argues that it clearly has a substantial interest in regulating the taking of its fish to ensure the resource is not exploited or depleted, and that the regulatory scheme at issue here informs this substantial interest because the state's interest in resource conservation outweighs the privacy interests of the angler. The state claims that this enforcement scheme is necessarily different from that used to enforce traffic regulations because automobile travel is "basic, pervasive, and often necessary," citing *Prouse*, 440 U.S. at 662, 99 S.Ct. 1391, while ice fishing is merely recreational.[7]

Second, the state argues that warrantless inspections are necessary to further Minnesota's regulatory scheme because the possibility of being randomly checked by a conservation officer is essential for deterring violations and protecting Minnesota wildlife.[8] As to the third requirement in *Burger*, the state asserts that its inspection program provides a constitutionally adequate substitute for a warrant because

**7.** The state further emphasizes these points by citing language from Justice Blackmun's concurrence in *Prouse* where he distinguished the state's interest in police spot-checks for motor vehicles from those at stake in the context of hunting and fishing:

> I would not regard the present case as a precedent that throws any constitutional shadow upon the necessarily somewhat individualized and perhaps largely random examinations by game wardens in the performance of their duties. In a situation of that type, it seems to me, the Court's balancing process, and the value factors under consideration, would be quite different.

440 U.S. at 664, 99 S.Ct. 1391 (Blackmun & Powell, JJ., concurring). But the views of the Supreme Court on federal constitutional protection from search and the views of this court based on the Minnesota Constitution do not always coincide. *Compare Sitz*, 496 U.S. at 455, 110 S.Ct. 2481, *with Ascher*, 519 N.W.2d at 187.

**8.** Amicus Minnesota Conservation Officers' Association (MCOA) joins in these arguments, adding that if a fish house is treated as a home for Fourth Amendment purposes it would render enforcement of the numerous resource preservation regulations impossible, or at least ineffective, as evidence could immediately be disposed of when the conservation officer requests permission to enter and a fish house could be moved before a warrant could be secured, if a warrant could be secured at all.

Minnesota statutes provide anglers with clear notice that random unannounced inspections will be conducted.

Respondent claims that these criteria are not met, but that even if they are, the exception to the warrant requirement articulated in *Burger* is limited to commercial activities and has no application to recreational ice fishing.[9] The state responds that it is reasonable under *Carter* to extend the *Burger* analysis to Minnesota fish houses because in *Carter*, the Supreme Court held that a short-term guest in another's home engaging in a commercial activity did not have a legitimate expectation of privacy to challenge a search of the home. 525 U.S. at 91, 119 S.Ct. 469. The Court emphasized the "purely commercial nature" of the transaction for which the guests were present, and despite the status of the premises as a dwelling, the Court held that property used for commercial purposes is treated differently for Fourth Amendment purposes than residential property. *Id.* at 90–91, 119 S.Ct. 469.

Relying on *Carter*, the state asserts that the applicability of *Burger* to fish houses cannot be dismissed merely by concluding that a fish house is not a place of business. The activity in which the occupants are engaged is also important and affects an individual's expectation of privacy. The state argues that the taking of fish is more like a closely regulated business than a domiciliary activity because it constitutes a property transaction between the state, as owner of the fish, and the angler who has actively chosen to participate and acquiesce in the regulatory scheme by ob-

taining a permit to fish in a fish house.[10] The conservation officer, then, is uniquely empowered to enforce these regulations not as an agent of the state's sovereign police power, but as a "warden" of the state's fish and game.

Respondent argues the state's reliance on *Carter* is misplaced, characterizing *Carter* as a case about standing, and rejects the state's argument that ice fishing is sufficiently similar to a "closely regulated" industry to justify a warrantless search. A more fitting analogy, respondent asserts, would be an unauthorized entry into a home, or perhaps a motor home, as many fish houses are equipped with similar amenities, and even if a fish house could be characterized as commercial property, the occupant still maintains at least some expectation of privacy, citing *Katz*, 389 U.S. at 359, 88 S.Ct. 507; *See v. City of Seattle*, 387 U.S. 541, 543, 87 S.Ct. 1741, 18 L.Ed.2d 930 (1967). *See also Burger*, 482 U.S. at 700, 107 S.Ct. 2636. Respondent goes on to argue that the statute on which the state relies to justify Officer Fritz's unauthorized entry is unconstitutional because it allows law enforcement to enter a private ice fishing house without restriction, according less constitutional protection to Minnesota citizens than they would enjoy under federal law, citing *State v. Sorenson*, 441 N.W.2d 455, 459 (Minn. 1989) ("A statute cannot confer rights on law enforcement officers that the U.S. Constitution denies.").

We do not perceive recreational ice fishing in a private fish house comparable to running an automobile junkyard business,

---

9. Respondent emphasizes this point by distinguishing the activity at issue here from "commercial fishing," defined under state law as "taking fish * * * for sale." Minn.Stat. § 97A.015, subd. 9 (2000).

10. The state asserts an angler is no different than a gun dealer who, by choosing to accept a federal license and engage in the business of dealing in guns, essentially consents to the various inspections authorized by law, citing *United States v. Biswell*, 406 U.S. 311, 316, 92 S.Ct. 1593, 32 L.Ed.2d 87 (1972).

operating a licensed gun dealership, or engaging in the sale of alcoholic beverages for purposes of the closely regulated industry exception. *See Burger,* 482 U.S. at 691, 107 S.Ct. 2636; *Biswell,* 406 U.S. at 311, 92 S.Ct. 1593; *Colonnade Catering Corp. v. United States,* 397 U.S. 72, 90 S.Ct. 774, 25 L.Ed.2d 60 (1970). Each of these industries is a narrow field of commercial activity where, absent regulations and readily ascertainable compliance, serious personal safety concerns or felony level criminal conduct could reasonably be expected. That is not the case here as no personal safety concern is at stake, and under our statutory scheme a violation of fishing regulations is a misdemeanor only.[11] Indeed, in the context of the regulatory scheme, it is no more pervasive or comprehensive than the state's traffic rules and regulations, *see* Minn.Stat. § 169.01 et seq., an area of law enforcement this court has consistently held may not be initiated without at least a reasonable articulable suspicion of unlawful conduct.[12]

As the Supreme Court noted in *Almeida–Sanchez v. United States,* 413 U.S. 266, 271, 93 S.Ct. 2535, 37 L.Ed.2d 596 (1973), in rejecting the government's reliance on *Colonnade* and *Biswell* as justification for an automobile search:

> A central difference between [*Colonnade* and *Biswell* ] and this [case] is that businessmen engaged in such federally licensed and regulated enterprises accept the burdens as well as the benefits of their trade, whereas the petitioner here was not engaged in any regulated or licensed *business.*

(emphasis added.) We conclude that angling from a fish house is not a closely regulated industry fitting within the exception to the need for constitutional authorization for a search as set forth in *Burger.*

While the state clearly has a strong interest in regulating and protecting its wildlife, by no means does that interest exceed the state's interest in saving human lives by deterring drunk driving on our roads found insufficient to outweigh the privacy interests of the occupant of a motor vehicle in *Ascher.* 519 N.W.2d at 187. The occupant of a fish house is entitled to the protections against unreasonable

---

**11.** Violations of the fish and game laws are generally categorized as misdemeanors. Minn.Stat. § 97A.301, subd. 6 (2000).

**12.** *See, e.g., State v. Britton,* 604 N.W.2d 84, 89 (Minn.2000) (holding fact that vehicle had broken window was insufficient to support trial court conclusion that officer had a reasonable and articulable suspicion of criminal activity justifying investigative stop); *State v. Pike,* 551 N.W.2d 919, 922 (Minn.1996) (finding officer's stop of vehicle thought to be driven by owner with revoked license was not unconstitutional because officer had a reasonable suspicion of criminal activity); *State v. Johnson,* 444 N.W.2d 824, 827 (Minn.1989) (finding stop of vehicle warranted where officer reasonably suspected driver of wrongdoing based on his evasive conduct); *Berge v. Comm'r of Public Safety,* 374 N.W.2d 730, 732–33 (Minn.1985) (stating vehicle stops are constitutional where police have reasonable belief that traffic violation has occurred);

*Marben v. State, Dep't of Public Safety,* 294 N.W.2d 697, 699 (Minn.1980) (concluding that hazardous driving reported by another driver was sufficient to provide officer with a specific and articulable suspicion of a violation sufficient to warrant vehicle stop); *State v. Engholm,* 290 N.W.2d 780, 784 (Minn. 1980) (concluding officer had specific and articulable reasons to suspect driver was under the influence of some intoxicant; thus investigative stop of vehicle was proper); *State v. Johnson,* 257 N.W.2d 308, 309 (Minn. 1977) (concluding evidence seized in vehicle stop must be suppressed where officer was unable to sufficiently articulate suspicion prompting stop); *State v. McKinley,* 305 Minn. 297, 303–04, 232 N.W.2d 906, 910–11 (Minn.1975) (holding that police may not stop a driver for a routine license check absent reasonable suspicion of any motor-vehicle violation or other crime).

search and seizure afforded by our federal and state constitutions, and while we do not hold that Minn.Stat. § 97A.215, subd. 3 is unconstitutional, we do hold that these constitutional protections must be read into the "at reasonable times" language of subdivision 3. *See* Minn.Stat. § 645.17(3) (2000) (providing the presumption that the legislature does not intend to violate the constitution of the United States or Minnesota Constitution). As conservation officers are subject to the same constitutional constraints as other law enforcement officers in the performance of their duties, the warrantless search of a fish house by a conservation officer is *per se* unreasonable in the absence of express consent or other circumstance justifying entry and therefore is unconstitutional under the Fourth Amendment of the United States Constitution and article I, § 10 of the Minnesota Constitution.

Affirmed.

MEYER, J., not having been a member of this court at the time of the argument and submission, took no part in the consideration or decision of this case.